IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | CIVIL 11-00257 LEK |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| GLOBAL HORIZONS, INC., DBA GLOBAL HORIZONS MANPOWER, INC.; CAPTAIN COOK COFFEE COMPANY LTD.; DEL MONTE FRESH PRODUCE (HAWAII), INC.; KAUAI COFFEE COMPANY, INC.; KELENA FARMS, INC.,; MAC FARMS OF HAWAII, LLC NKA MF NUT CO., LLC; MAUI PINEAPPLE COMPANY, LTD. AKA MAUI PINEAPPLE FARMS; ALEXANDER & BALDWIN, INC.; MASSIMO ZANETTI BEVERAGE USA, INC.; AND DOES 1-15, INCLUSIVE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**ORDER GRANTING PLAINTIFF'S: MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF HOSTILE WORK ENVIRONMENT AGAINST DEFENDANT GLOBAL HORIZONS, INC.; MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF DISPARATE TREATMENT AGAINST GLOBAL HORIZONS, INC.; AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF RETALIATION AGAINST GLOBAL HORIZONS, INC.**

Before the Court are Plaintiff Equal Employment Opportunity Commission's ("the EEOC" or "Plaintiff"): Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Claim of Hostile Work Environment Against Defendant Global Horizons,

Inc.,[1] ("Hostile Work Environment Motion") filed on
November 1, 2013; [dkt. nos. 606-07;] the EEOC's Motion for
Partial Summary Judgment on the EEOC's Pattern or Practice Claim
of Disparate Treatment Against Global Horizons, Inc. ("Disparate
Treatment Motion"), filed on November 1, 2013; [dkt. nos. 610,
612;] and the EEOC's Motion for Partial Summary Judgment on the
EEOC's Pattern or Practice Claim of Retaliation Against Global
Horizons, Inc. ("Retaliation Motion"), filed on November 1, 2013
[dkt. nos. 616, 618].[2]  Global Horizons did not respond to the
EEOC's motions.[3]  On December 6, 2013, the EEOC filed a
consolidated reply as to all four of its motions, emphasizing
Global Horizons's failure to respond.  [Dkt. no. 659.]

---

[1] This Court will refer to Defendant Global Horizons, Inc.
d/b/a Global Horizons Manpower Inc. as "Global Horizons."

[2] This Court will refer to the Hostile Work Environment
Motion, the Disparate Treatment Motion, and the Retaliation
Motion collectively as the "Merits Motions."  The EEOC also filed
a Motion for Partial Summary Judgment on Global Horizons's
Affirmative Defenses ("Affirmative Defenses Motion") on
November 1, 2013.  [Dkt. nos. 594-95.]  On February 28, 2014,
this Court issued an order that, inter alia, granted the
Affirmative Defenses Motion in part and denied it in part
("2/28/14 Order").  [Dkt. no. 628.]  This Court also issued a
second order on February 28, 2014 which addressed the EEOC's
motions related to its claims against Defendant Maui Pineapple
Company, Ltd., [dkt. no. 638,] but those motions and that order
are not relevant to the Merits Motions currently before this
Court.

[3] On November 18, 2013, Defendant Kelena Farms, Inc. filed a
statement of no position as to each of the Merits Motions.  [Dkt.
nos. 654, 656-57.]

The Court finds these matters suitable for disposition without a hearing pursuant to Rule LR7.2(d) of the Local Rules of Practice of the United States District Court for the District of Hawai`i ("Local Rules").  After careful consideration of the motions and the relevant legal authority, the EEOC's Hostile Work Environment Motion, the EEOC's Disparate Treatment Motion, and the EEOC's Retaliation Motion are HEREBY GRANTED, for the reasons set forth below.

## BACKGROUND

This Court set out the general background of this case in the 2/28/14 Order, and will only address the allegations that are relevant to the motions currently before it.

The motions currently before this Court address the EEOC's claims against Global Horizons for pattern or practice of discriminatory treatment based on national origin, retaliation, and/or constructive discharge, in violation of 42 U.S.C. §§ 2000e-2(a), 2000e-3(a) ("Count I").  [Third Amended Complaint, filed 6/4/12 (dkt. no. 263), at ¶¶ 622-26, 642-44.]  Count I alleges, in pertinent part:

623. At all times relevant to this action, the Claimants[4] were employed by Global [Horizons].

624. Since 2003, Global [Horizons] supplied the Claimants to work at one or more farms owned and operated by the Farm Defendants.

625. Since 2003, Global [Horizons] engaged in a pattern or practice of unlawful discriminatory employment practices at its facilities in Los Angeles and Beverly Hills, California and at the Farm Defendants' farms located in Oahu, Maui, and, Kauai, and Hawaii in violation of §§ 703(a) and 704(a) of Title VII, 42 U.S.C. § 2000e-2(a) by discriminating against the Claimants with respect to the terms and conditions of their employment because of their Asian race and/or Thai national origin; subjecting the Claimants to harassment and hostile work environment because of their Asian race and/or Thai national origin; retaliating against employees for engaging in protected activity including but not limited to opposing and/or complaining about the discriminatory terms and conditions of employment, harassment, and/or hostile work environment; and/or constructively discharged the Claimants by subjecting them to intolerable working conditions and/or terms and conditions of employment.

626. Global [Horizons]'s pattern and/or practice of discriminatory treatment includes, without limitation, harassment, hostile work environment, disparate treatment, constructive discharge, and retaliation against employees for engaging in protected activity including but not limited to opposing and/or complaining about the

---

[4] "The Claimants" refers to "Marut Kongpia, Nookrai Matwiset, Jakarin Phookhiew, Mongkol Bootpasa, Janporn Suradanai, Suthat Promnonsri, Itthi Oa-Sot, and the class of Thai and/or Asian individuals . . . who were adversely affected by" the discrimination and retaliation at issue in this case. [Third Amended Complaint at § I.]

4

discriminatory terms and conditions of employment, harassment, and/or hostile work environment.

[Id. at ¶¶ 623-26.]

The EEOC served three sets of requests for admissions ("RFA") on Global Horizons, but Global Horizons neither answered nor objected to any of the three sets of RFA.  [Decl. of Sue Noh in Supp. of Pltf. EEOC's Motions for Partial Summary Judgment Against Global Horizons, Inc. Re: Pattern or Practice of Disparate Treatment, Hostile Environment & Retaliation, filed 11/1/13 (dkt. no. 628) ("Noh Decl."),[5] at ¶¶ 1-2; id., Exh. 1 (RFA Set 1 (Nos. 1-709)); id., Exh. 2 (RFA Set 2 (Nos. 710-1210)).]  The EEOC argues that, pursuant to Fed. R. Civ. P. 36(a)(3), the matters in the RFA sets are deemed admitted as a matter of law.

The EEOC further argues that, based on the undisputed facts of this case, it is entitled to summary judgment as to the pattern and practice claims of hostile work environment, disparate treatment, and retaliation in Count I.  This Court notes that, insofar as the EEOC's Merits Motions all rely on pattern and practice allegations, this Court does not construe the Merits Motions as addressing the other counts in the Third Amended Complaint.

---

[5] The exhibits to the Noh Declaration are contained in docket numbers 628-631.

## DISCUSSION

### I.   Admission of Material Facts

At the outset, this Court notes that Global Horizons failed to respond either to the EEOC's Merits Motions or the EEOC's concise statements of fact in support of the Merits Motions (collectively "Merits CSOFs").[6]  Local Rule 56.1(g) states: "For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party."  Thus, this Court HEREBY DEEMS ADMITTED all of the statements of fact set forth in the EEOC's Merits CSOFs.

### II.  Standard for Pattern and Practice Claims

In ruling on Global Horizons's motion to dismiss the Third Amended Complaint, United States District Judge David Alan Ezra, described some of the requirements for Count I:

> In order to establish a pattern or practice
> of discriminatory treatment in violation of Title

---

[6] The Merits CSOFs consist of: the EEOC's Concise Statement of Material Facts in Support of Its Motion for Partial Summary Judgment Against Global Horizons Re: Hostile Work Environment ("Hostile Work Environment CSOF"); the EEOC's Concise Statement of Material Facts in Support of Its Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Disparate Treatment Claim Against Global Horizons ("Disparate Treatment CSOF"); and the EEOC's Concise Statement of Material Facts in Support of Its Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Retaliation Claim Against Global Horizons ("Retaliation CSOF"), all of which the EEOC filed on November 1, 2013.  [Dkt. nos. 608, 613, 619.]

VII, a plaintiff must show "'more than the mere occurrence of isolated or accidental or sporadic discriminatory acts.'" Obrey v. Johnson, 400 F.3d 691, 694 (9th Cir. 2005) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)). Plaintiff must show that the discrimination was the defendant's "'standard operating procedure—the regular rather than the unusual practice.'" Id. (quoting Teamsters, 431 U.S. at 336, 97 S. Ct. 1843).

EEOC v. Global Horizons, Inc., 904 F. Supp. 2d 1074, 1085 (D.

Hawai`i 2012) ("11/8/12 Order"). In Teamsters, the United States

Supreme Court stated:

> At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

431 U.S. at 360 (footnote omitted).

## III. **Hostile Work Environment**

In the related context of a claim alleging hostile work

environment based on gender, the Ninth Circuit has stated:

> A plaintiff may establish a sex hostile work environment claim by showing that he was subjected to verbal or physical harassment that was sexual

7

> in nature, that the harassment was unwelcome and
> that the harassment was sufficiently severe or
> pervasive to alter the conditions of the
> plaintiff's employment and create an abusive work
> environment. A plaintiff must establish that the
> conduct at issue was both objectively and
> subjectively offensive: he must show that a
> reasonable person would find the work environment
> to be "hostile or abusive," and that he in fact
> did perceive it to be so. Faragher v. City of
> Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275,
> 141 L. Ed. 2d 662 (1998). . . .

Dawson v. Entek Int'l, 630 F.3d 928, 937-38 (9th Cir. 2011) (some

citations omitted). Applying this analysis in the instant case,

the EEOC must establish that: the Claimants were subjected to

verbal or physical harassment that was based on their race or

national origin; the harassment was objectively and subjectively

offensive; the harassment was unwelcome; and the harassment was

sufficiently severe or pervasive to alter the conditions of the

Claimants' employment.

"When harassment by a supervisor is at issue, an

employer is vicariously liable, subject to a potential

affirmative defense." Id. at 939 (citing Nichols v. Azteca Rest.

Enter., Inc., 256 F.3d 864, 877 (9th Cir. 2001) (citing Faragher

v. City of Boca Raton, 524 U.S. 775, 780, 118 S. Ct. 2275, 141 L.

Ed. 2d 662 (1998))).

> An employer is vicariously liable for actions by a
> supervisor who has "immediate (or successively
> higher) authority over the employee." Faragher,
> 524 U.S. at 807, 118 S. Ct. 2275. This
> distinction "is not dependent upon job titles or
> formal structures within the workplace, but rather
> upon whether a supervisor has the authority to

demand obedience from an employee." McGinest [v. GTE Serv. Corp.], 360 F.3d [1103,] 1119 n.13 [(9th Cir. 2004)].

Id. at 940. Nichols sets forth the two-pronged analysis for an employer's affirmative defense to a claim of a hostile work environment created by a supervisor. 256 F.3d at 877. This Court will not address the Nichols analysis because, insofar as Global Horizons did not respond to the Hostile Work Environment Motion, Global Horizons has not identified any genuine issue of material fact as to any affirmative defenses to its liability for the actions of Claimants' supervisors. See Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").

In the instant case, Global Horizons has admitted that Sam Wongsesanit (Global Horizons's field supervisor), Shane Germann (Global Horizons's regional manager), and Joseph Knoller (Global Horizons's vice president) physically abused some of the Claimants. [Hostile Work Environment CSOF at 1-2.[7]] Wongsesanit and Germann "supervised Claimants" and "had immediate authority to discharge, discipline, and control work schedule, wages, and housing." [Id. at 1.]

---

[7] The EEOC did not number each item in the Hostile Work Environment CSOF. This Court's citations to the Hostile Work Environment CSOF therefore refer to the document's page numbers.

The following are examples of incidents that Global Horizons has admitted occurred:

• In 2004 at the Maui Pineapple Company, Ltd. farm ("Maui Pineapple"), after Wongsesanit accused Claimant Anucha Homphet of helping a co-worker escape, he forced Homphet to meet with Knoller, and Knoller immediately slapped Homphet's head.  [Id. at 2; Noh Decl., Exh. 24 (Decl. of Anucha Homphet)[8] at ¶¶ 18-19.]

• Wongsesanit broke the sunglasses off Claimant Prakran Radchai's face when Radchai forgot to bring his protective eyewear to work.  [Hostile Work Environment CSOF at 2; Noh Decl., Exh. 16 (Decl. of Prakran Radchai) at ¶ 18.]

• In 2004 at Maui Pineapple, Wongsesanit grabbed one of the Claimants by the shirt and threw him against a wall.  [Hostile Work Environment CSOF at 2.]

• Wongsesanit threatened Maui Pineapple Claimants with a gun and routinely carried a baseball bat during meetings and at the Claimants' housing facility to enforce the curfew.  [Id. at 2-3.]

• Wongsesanit grabbed some of the Claimants by the throat during meetings, punched some of the Claimants in the face, pushed a Claimant who inquired about the lack of work hours, and hit a Claimant with a stick to make him work faster.  [Id. at 3.]

---

[8] The Claimants' original declarations are written in Thai, see, e.g., Noh Decl., Exh. 24 at 12-17.  Supachai Prasertphong translated the Thai declarations into English and submitted declarations attesting to the accuracy and truthfulness of the translations.  See id. at 2-4.  Thus, each of the pertinent exhibits to the Noh Declaration consist of Prasertphong's declaration, the English translation of the Claimant's declaration, and the Claimant's original Thai declaration.  The Court's citations to the Claimants' declarations refer to the English translations.  See id. at 5-11.

10

Global Horizons also admitted that its supervisors routinely verbally harassed Claimants.[9]  For example, Knoller told Claimants that anyone who ran away would be shot, deported, or arrested.  Wongsesanit threatened Claimants with physical abuse and deportation.  [Id. at 3-4.]  Wongsesanit, Pranee Tubchumpol (Global Horizons's director of international relations),[10] and Germann routinely threatened Claimants that they would be deported if they did not work faster or harder, if they tried to escape, or if they complained about or questioned the working or living conditions.  [Id. at 1, 4.]

In addition,

- "Global [Horizons's] supervisors kept Claimants confined, restricted their movements and contact with the outside world even prohibiting Thai newspapers, and imposing curfews, bedtimes, and security guards."  [Id. at 4.]

- "Global [Horizons] denied the required food, housing, and transportation to Claimants thereby worsening the hostile work environment because these failures left Claimants malnourished and fearful for their personal safety."  [Id.]

- "Claimants who fainted in the fields from exhaustion and malnutrition, were injured, or became ill were denied medical care and threatened with deportation or transfers to farms with less or harsher work."  [Id. at 5.]

_____

[9] The EEOC submitted testimony that Wongsesanit "verbal[ly] abuse[d]" Thai workers by calling them "animals."  [Noh Decl., Exh. 3 (Decl. of Amnuay Phiansing) at ¶ 14.]

[10] Tubchumpol interviewed Claimants in Thailand and was one of their supervisors in the United States.  [Hostile Work Environment CSOF at 1.]

Based on Global Horizons's admissions and the undisputed evidence that the EEOC has submitted in connection with the Hostile Work Environment Motion, this Court finds that there is no genuine issue of material fact as to the physical and verbal harassment that Global Horizons subjected the Claimants to.  This Court finds that: Knoller, Tubchumpol, Germann, and Wongsesanit physically and verbally harassed the Claimants; Tubchumpol, Germann, and Wongsesanit had immediate supervisory authority over the Claimants; the harassment was their regular practice; the harassment was unwelcome; the Claimants perceived the work environment as abusive; and a reasonable person would find the work environment to be hostile or abusive.

In considering whether the harassment was sufficiently severe and pervasive to alter the conditions of the Claimants' employment, this Court must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1122 (9th Cir. 2008) (citations and quotation marks omitted).  In light of the circumstances of this case, as established by Global Horizons's admissions and the undisputed evidence that EEOC submitted in connection with the Hostile Work Environment Motion, this Court

12

finds that there is no genuine issue of material fact as to the extent of the harassment the Claimants suffered.  This Court finds that the harassment that the Claimants suffered was sufficiently severe and pervasive to alter the conditions of their employment.

In addition, this Court concludes that, as a matter of law, Global Horizons is vicariously liable for the harassment that Tubchumpol, Germann, and Wongsesanit perpetuated against the Claimants, see Dawson, 630 F.3d at 940, and Global Horizons is liable for the harassment that Knoller, one of Global Horizons's corporate officers, perpetuated against Claimants.

This Court next turns to the issue of whether the harassment that the Claimants suffered was based upon their race and/or national origin.  Global Horizons has admitted that Claimants complained to Global Horizons supervisors that they were treated worse than the non-Thai workers.  [Hostile Work Environment CSOF at 5.]  Global Horizons has also admitted that it "ratified its Thai recruiters charging Claimants' excessive recruitment fees by ignoring Claimants' complaints about the fees because the debt from the fees kept Claimants more compliant and vulnerable to abuse."  [Id. at 1-2.]  Global Horizons exploited the enormous debts the Thai workers incurred to pay the recruitment fees.  The EEOC presented evidence that Wongsesanit constantly threatened Claimants with deportation to Thailand or

13

transfer to farms where they would earn less money because he knew that the Thai workers "were hopelessly in debt" because of the recruitment fees.  See, e.g., Noh Decl., Exh. 3 (Decl. of Amnuay Phiansing) at ¶¶ 4, 20.

In addition, the EEOC has presented evidence that Global Horizons specifically chose Thai workers based on a stereotype that Thai workers would be more compliant and less likely to escape or cause other problems.  Global Horizons's stereotyping is relevant to the EEOC's establishment that the Claimants' race and/or national origin played a motivating part in Global Horizons's employment decisions.  Cf. Jespersen v. Harrah's Operating Co., 444 F.3d 1104, 1111 (9th Cir. 2006) ("in establishing that 'gender played a motivating part in an employment decision,' a plaintiff in a Title VII case may introduce evidence that the employment decision was made in part because of a sex stereotype" (quoting Price Waterhouse v. Hopkins, 490 U.S. 228, 250-51, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989))).

Global Horizons has admitted that Mordechai Orian, its chief executive officer, "specifically sought Thai nationals to fulfill the farm labor contracts believing that Thai workers would be easier to exploit than workers from other national origins and/or races," and Global Horizons "selectively recruited impoverished, uneducated Thai workers who couldn't speak English,

14

and had no family or contacts in the US so they couldn't escape
or question Global [Horizons]." [Hostile Work Environment CSOF
at 1.] Orian believed that, in general, "Thai people, they are
good people, nice people. And they just follow. . . ." [Noh
Decl., Exh. 1 at Nos. 64.] Specifically, Orian believed that, as
workers in the United States Department of Labor ("Labor
Department") H-2A guest worker program, the Claimants would "just
follow." [Id. at No. 65.] Orian previously hired workers from
Mexico, China, and Nepal, but he had problems with those workers
because they often disappeared. Orian stated that he believed
that Claimants would not leave. [Id. at Nos. 66-69.] Orian has
stated: "That's why we decide to go with Thailand, because the
ration - ratio at that time of people who be absconded [sic] was
3 percent, 2 percent compared to 80 percent, 90 percent, 100
percent from other countries . . . ." [Id. at No. 70 (alteration
in original).] He also stated, "you just go to countries. You
know it's going to be easier and they're going to stay on the
job. . . That's why Thailand." [Id. at No. 71 (alteration in
original).] Global Horizons has not presented any contrary
evidence regarding the motivating factors behind the harassment
that the Claimants suffered.

Based on Global Horizons's admissions and the
uncontroverted evidence that the EEOC has presented in connection
with the Hostile Work Environment Motion, this Court finds that

15

there is no genuine issue of material fact as to the motivation behind Global Horizons's harassment of the Claimants.  This Court finds that Global Horizons subjected the Claimants to physical and verbal harassment based on Claimants' race and/or national origin in order to secure the Claimants' compliance and obedience and based upon stereotypical beliefs about Thai workers.

This Court therefore concludes that the EEOC has proven all of the elements of its pattern and practice claim of hostile work environment against Global Horizons.  Further, Global Horizons has not identified any genuine issue of material fact as to any substantive defense to the EEOC's pattern and practice claim of hostile work environment.  The EEOC is entitled to judgment as a matter of law as to the portion of Count I alleging a pattern and practice claim of hostile work environment against Global Horizons.  See Fed. R. Civ. P. 56(a).  The EEOC's Hostile Work Environment Motion is therefore GRANTED.

## IV.  Disparate Treatment

Courts analyze Title VII discrimination claims and retaliation claims under the burden-shifting analysis set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973).  See, e.g., Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1155 (9th Cir. 2010) (discrimination); Dawson, 630 F.3d at 936 (retaliation).  The Ninth Circuit has stated that disparate treatment discrimination occurs

"where an employer has treated a particular person less favorably than others because of a protected trait." Ricci v. DeStefano, 557 U.S. 557, 129 S. Ct. 2658, 2672, 174 L. Ed. 2d 490 (2009) (internal quotation marks and alterations omitted). "A disparate-treatment plaintiff must establish that the defendant had a discriminatory intent or motive for taking a job-related action." Id. (internal quotation marks omitted). A discriminatory motive may be established by the employer's informal decisionmaking or "a formal, facially discriminatory policy," but "liability depends on whether the protected trait . . . actually motivated the employer's decision." Hazen Paper Co. v. Biggins, 507 U.S. 604, 610, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993). "It is insufficient for a plaintiff alleging discrimination under the disparate treatment theory to show the employer was merely aware of the adverse consequences the policy would have on a protected group." Am. Fed'n of State, Cnty., & Mun. Emps. v. Washington, 770 F.2d 1401, 1405 (9th Cir. 1985).

Wood v. City of San Diego, 678 F.3d 1075, 1081 (9th Cir. 2012)

(alteration in Wood). Under the burden-shifting analysis:

If plaintiffs establish a prima facie case, "[t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action." Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123–24 (9th Cir. 2000). If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination. Noyes [v. Kelly Servs.], 488 F.3d [1163,] 1168 [(9th Cir. 2007)].

Hawn, 615 F.3d at 1155 (some alterations in Hawn) (some citations omitted).

17

In the Disparate Treatment Motion, the EEOC argues that Global Horizons "engaged in barbaric security measures to hold [the Claimants] as a captive workforce." [Mem. in Supp. of Disparate Treatment Motion at 32.] Claimant Amnuay Phiansing's declaration states: "During my employment at Maui Pineapple, the Thai workers and I were prohibited from leaving the housing and work premises without Global [Horizons]'s permission, reading the Thai newspaper, and speaking to strangers/outsiders. Global [Horizons] also subjected us to a curfew and daily head count." [Noh Decl., Exh. 3 at ¶ 8.] Claimant Aniwat Khadphab's declaration, Claimant Chakkrapong Khongkhao's declaration, Claimant Jakarin Phookhiew's declaration, and Claimant Liam Kajai's declaration describe similar conditions. [Id., Exh. 5 at ¶ 9; id., Exh. 6 at ¶ 8; id., Exh. 10 at ¶ 8; id., Exh. 13 at ¶ 9.] Some of the Claimants stated that, once Global Horizons brought them to the United States, their passports were immediately confiscated. See, e.g., Noh Decl., Exh. 5 at ¶ 6; id., Exh. 6 at ¶ 5; id., Exh. 13 at ¶ 5. Phookhiew also stated that, at Maui Pineapple, "[t]here was a high metal fence containing three layers of wire surrounding our housing facility," and that he "felt like a prisoner." [Noh Decl., Exh. 10 at ¶ 8.] Claimant Liam Kajai also felt like a prisoner because, at the second housing location he was assigned to, Global Horizons had ten security guards patrolling the area

18

twenty-four hours a day.  Tubchumpol and Germann told the workers
that the security guards were immigration officials who would
arrest any worker who tried to escape.  [Id., Exh. 13 at ¶ 16.]

Global Horizons has admitted that "Micronesian and
Filipino workers were not subjected to security measures, daily
head counts/roll calls or held as a captive workforce."
[Disparate Treatment CSOF at ¶ 33.]  Global Horizons has also
admitted that:

•it routinely denied Claimants breaks during the work day, but
    Micronesian and Filipino workers had two fifteen-minute
    breaks per day; [id. at ¶¶ 16, 36;]

•it imposed a work production quota on the Claimants at the
    Mac Farms of Hawaii, LLC farm ("Mac Farms"), but it did not
    impose work production goals on the Filipino workers; [id.
    at ¶¶ 23, 34;]

•it demanded that the Claimants work faster than the non-Thai
    workers; [id. at ¶ 44;]

•Claimants were assigned to less desirable and more demeaning
    jobs at the various farms than the non-Thai workers, such as
    the Filipino workers; [id. at ¶¶ 37-39;]

•at some of the farms, Claimants were paid less than the non-Thai
    workers; [id. at ¶¶ 40-42;] and

•non-Thai workers were scheduled for more work hours and were
    never deprived of their wages, while Global Horizons failed
    to schedule the Claimants for the work hours it promised
    them, and routinely delayed payment or failed to pay
    Claimants for work they had already performed [id. at ¶¶ 24,
    26-27, 43].

In addition, while the Micronesian workers were allowed to own a
car, drink alcohol, and listen to loud music during their free
time, the Thai workers were not allowed to do so.  [Id. at ¶ 45;

Noh Decl., Exh. 28 (Decl. Of Itthi Oa Sot) at ¶¶ 18-19.]   In fact, Global Horizons required all Thai workers at Maui Pineapple to eat only in the cafeteria and prohibited them from cooking their own food.  Further, although Global Horizons deducted weekly amounts from their paycheck for food, they did not provide adequate food to the Thai workers, and there were often food shortages for the Thai workers.  The Thai workers' meals often consisted only of rice and a piece of pineapple or a hard-boiled egg.  [Noh Decl., Exh. 3 at ¶ 10; id., Exh. 6 at ¶ 10; id., Exh. 7 at ¶ 11.]  The Micronesian workers received an adequate amount of food and better quality food.  They were also allowed to cook their own food.  [Noh Decl., Exh. 7 at ¶ 12.]  The Micronesian workers also did not have to share their sleeping quarters with as many other workers as the Thai workers did.  [Id., Exh. 11 at ¶ 15.]

          The evidence clearly establishes that Global Horizons's standard operating procedure was to treat the Thai workers less favorably than the non-Thai workers.  As previously addressed in connection with the Hostile Work Environment Motion, the record clearly establishes that Global Horizons acted upon stereotypical beliefs about the Thai workers and that Global Horizons exploited the Claimants' indebtedness and the perceived compliant nature of Thai people.  Thus, the evidence supports a finding that the motivation for Global Horizons's disparate treatment of Claimants

20

was Global Horizons's desire to force them into compliance and obedience and to prevent the Claimants from escaping. Global Horizons has not identified any evidence which suggests that there is a genuine issue of fact as to the existence of a non-discriminatory motivation for its treatment of the Thai workers.

Based on Global Horizons's admissions and the uncontroverted evidence that the EEOC has presented in connection with the Disparate Treatment Motion, this Court finds that there is no genuine issue of material fact as to the EEOC's pattern and practice claim of disparate treatment against Global Horizons. This Court finds that the undisputed record in this case establishes that Global Horizons treated the Claimants less favorably than other workers because of the Claimants' race and/or national origin. Further, the disparate treatment of Thai workers was Global Horizons's standard operating procedure. This Court concludes that the EEOC has established its prima facie case as to its pattern and practice claim of disparate treatment by Global Horizons.

Global Horizons has not identified any evidence suggesting that there is a genuine issue of material fact as to the burden-shifting analysis. This Court therefore concludes that the EEOC is entitled to judgment as a matter of law as to the portion of Count I alleging a pattern and practice claim of

disparate treatment by Global Horizons.   The EEOC's Disparate

Treatment Motion is GRANTED.

**V.     Retaliation**

Title VII prohibits retaliation.   Title VII states

that:

> It shall be an unlawful employment practice for an
> employer to discriminate against any of his
> employees . . . because he has opposed any
> practice made an unlawful employment practice by
> this subchapter, or because he has made a charge,
> testified, assisted, or participated in any manner
> in an investigation, proceeding, or hearing under
> this subchapter.

42 U.S.C. § 2000e-3(a).   The two parts are known as the

"opposition clause" and the "participation clause."   See, e.g.,

Learned v. City of Bellevue, 860 F.2d 928, 932 (9th Cir. 1988).

This Court has recognized that:

> [T]he opposition clause, by its terms,
> protects only those employees who oppose what
> they reasonably perceive as discrimination
> under the Act.   An employee need not
> establish that the opposed conduct in fact
> violated the Act in order to establish a
> valid claim of retaliation.   [Sias v. City
> Demonstration Agency, 588 F.2d 692, 695 (9th
> Cir. 1978).]   That is, an employee may fail
> to prove an "unlawful employment practice"
> and nevertheless prevail on his claim of
> unlawful retaliation.   However, the opposed
> conduct must fairly fall within the
> protection of Title VII to sustain a claim of
> unlawful retaliation.   Silver v. KCA, Inc.,
> 586 F.2d 138, 142 (9th Cir. 1978) ("under the
> clear language of the "opposition" clause of
> [section] 704(a), a case of retaliation has
> not been made out unless the "retaliation"
> relates to the employee's opposition to a
> [section] 703 violation"); see also Sias, 588

22

F.2d at 695-96 ("[a]lthough the [district] court made no explicit finding that Sias' opposition was based on a reasonable belief that the City's employment practices violated Title VII, such a finding is implicit here") (footnote omitted).

. . . .

The participation clause is broadly construed to protect employees who utilize the tools provided by Congress to protect their rights. <u>Sias</u>, 588 F.2d at 695. As with the opposition clause, it is not necessary to prove that the underlying discrimination in fact violated Title VII in order to prevail in an action charging unlawful retaliation. <u>Id.</u> "If the availability of that protection were to turn on whether the employee's charge were ultimately found to be meritorious, resort to the remedies provided by the Act would be severely chilled." <u>Id.</u> (citation omitted).

The mere fact that an employee is participating in an investigation or proceeding involving charges of some sort of discrimination, however, does not automatically trigger the protection afforded under section 704(a); the underlying discrimination must be reasonably perceived as discrimination prohibited by Title VII. <u>See generally</u>, G. Rutherglen, Major Issues in the Federal Law of Employment Discrimination 47-48 (Federal Judicial Center 1987). Thus, even if the filing of Title VII charges with a state agency such as the [Human Rights Commission ("HRC")] could be construed as participation in an investigation, proceeding, or hearing under Title VII, <u>see</u> <u>Hicks v. Abt Assocs.</u>, 572 F.2d 960, 968-69 (3d Cir. 1978), the HRC filing does not fall within the protection of 704(a) in this case because Learned did not allege discrimination prohibited by Title VII. . . .

[<u>Learned</u>, 860 F.2d at 932] (some alterations in <u>Learned</u>). The participation clause only prohibits

> retaliation against persons who participate in the
> EEOC process. See, e.g., Greisen v. City of North
> Las Vegas, 251 Fed. Appx. 462, 463 (9th Cir. 2007)
> (citing Vasconcelos v. Meese, 907 F.2d 111, 113
> (9th Cir. 1990)).

Phillips v. Mabus, Civil No. 12-00384 LEK-RLP, 2013 WL 4662960,

at *13-14 (D. Hawai`i Aug. 29, 2013).

Generally, "[t]o make out a prima facie retaliation

case, [the plaintiff has] to show that she engaged in protected

activity, that she suffered a materially adverse action, and that

there was a causal relationship between the two." Westendorf v.

W. Coast Contractors of Nev., Inc., 712 F.3d 417, 422 (9th Cir.

2013) (some citations omitted) (citing Burlington Northern &

Santa Fe Ry. Co. v. White, 548 U.S. 53, 57, 126 S. Ct. 2405, 165

L. Ed. 2d 345 (2006)).

Global Horizons has admitted that the Claimants at Maui

Pineapple complained that Global Horizons forced them to work

harder than the non-Thai workers. [Retaliation CSOF at ¶¶ 22.]

The EEOC also presented evidence that the Claimants at Maui

Pineapple also raised the issues of inadequate work hours, non-

payment of wages, unauthorized paycheck deductions, poor living

conditions, and lack of sufficient food. [Noh Decl., Exh. 25

(Decl. of Apichart Peayer) at ¶ 13; id., Exh. 27 (Decl. of

Bunyarit Pengbunma), at ¶ 15; id., Exh. 16 (Decl. of

Prakran Radchai), at ¶ 17.] Global Horizons has admitted that

its supervisors, Wongsesanit, Tubchumpol, and Germann, ignored or

belittled the complaints at Maui Pineapple.  [Retaliation CSOF at ¶ 22.]  Global Horizons also admitted that its supervisors responded to these complaints by threatening Claimants with deportation, by challenging them to fights, and by using physical force.  [Id. at ¶ 25.]  Global Horizons further admitted that, when the Labor Department investigated Global Horizons at Maui Pineapple, Wongsesanit and Tubchumpol told Claimants either to refuse to talk to the investigators or to lie about Claimants' compensation problems.  [Id. at ¶ 27.]  Claimant Pengbunma was one of the workers who the investigators spoke to.  He states that, when he started to tell the investigators about not being assigned enough work and about the living conditions, Wongsesanit ordered the investigators to leave and ordered Pengbunma and the other workers to stop talking and return to the dormitory. Wongsesanit later threatened them with deportation if they spoke with any government officials again.  [Noh Decl., Exh. 27 at ¶¶ 16-17.]

      As to the Claimants at the Del Monte Fresh Produce (Hawaii) farm ("Del Monte"), Global Horizons admits that they complained to Global Horizons supervisors about not being assigned enough work hours and about payment delays.  The Del Monte Claimants also raised those complaints, as well as complaints about the exorbitant recruiting fees they paid, to the Labor Department.  In response to the internal complaints, the

Global Horizons supervisors threatened to deport the workers who complained or to transfer them to farms where they would work less and be paid less.  When Global Horizons learned about the complaints to the Labor Department and that the Del Monte Claimants were cooperating in the Labor Department's investigation, Tubchumpol told them that they were not to talk to anyone from the federal agency and that anyone who did so would be deported.  [Id. at ¶¶ 29-32.]

As to the Claimants at Mac Farms, Global Horizons admits that they complained to Global Horizons supervisors about payment issues, not having enough water, uninhabitable living conditions, and having to pay for transportation to the grocery store.  In response, Global Horizons supervisors threatened the Mac Farms Claimants with deportation and told them not to tell anyone about their problems.  Wongsesanit also refused to transport any of the Mac Farms Claimants to the grocery store unless they paid him.  [Id. at ¶¶ 35-36, 38.]

As to the Claimants at the Captain Cook Coffee Company, Ltd. farm ("Captain Cook"), Global Horizons admits that they complained about payment issues, being forced to work under difficult conditions, and being forced to work when they were sick.  After two Claimants at Captain Cook made such complaints, Tubchumpol transferred them to other farms.  [Id. at ¶¶ 40-42.]

26

As to the Claimants at the Kelena Farms, Inc. farm ("Kelena Farms"), Global Horizons admits that they complained to both Global Horizons supervisors and the farm itself about the recruitment fees and about not being paid for work performed. Tubchumpol met with the Kelena Farms Claimants, but merely told them to stop complaining. [Id. at ¶¶ 43-45.]

Global Horizons has not identified any evidence to the contrary. Based on Global Horizons's admissions and the uncontroverted evidence that the EEOC has submitted in connection with the Retaliation Motion, this Court finds that there is no genuine dispute of material fact as to the issue of whether the Claimants engaged in protected activity. The district court has already recognized in this case that it is irrelevant whether or not the Claimants specifically complained that they were being mistreated because of their race or national origin.

> The Ninth Circuit has held that "an employee who complains of a practice that has a disproportionate impact on a protected group complains of unlawful discrimination and is protected by the opposition clause." Gifford v. Atchison, Topeka & Santa Fe Ry. Co., 685 F.2d 1149, 1157 (9th Cir. 1982). The complaining employee need not "be aware that the practice is unlawful under Title VII at the time of the opposition in order for opposition to be protected." Id.
>
>         . . . .
>
>      . . . As the Ninth Circuit held in Gifford, a complaining employee need not be aware that a complained-of practice violates Title VII in order for the complaint to be protected. 685 F.2d at

27

> 1157.  After all, "[i]t requires a certain
> sophistication for an employee to recognize that
> an offensive employment practice may represent
> . . . discrimination that is against the law."
> <u>Id.</u>

11/8/12 Order, 904 F. Supp. 2d at 1088-89 (some alterations in

11/8/12 Order).  This Court therefore finds that the Claimants

engaged in protected conduct for purposes of the opposition

clause by making multiple complaints about Global Horizons's

discriminatory treatment of them.  As this Court has found,

Global Horizons subjected the Claimants to discriminatory

treatment based upon their race and/or national origin.  This

Court therefore finds that the EEOC has established the protected

activity requirement of its prima facie case.  This Court now

turns to the adverse action requirement.

    This Court has stated:

> For the purposes of [a] Title VII retaliation
> claim, an adverse employment action is one that "a
> reasonable employee would have found . . .
> materially adverse, which in [the retaliation]
> context means it well might have dissuaded a
> reasonable worker from making or supporting a
> charge of discrimination." <u>Burlington N. R .R. &
> Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68, 126 S.
> Ct. 2405, 165 L. Ed. 2d 345 (2006).  Threats may
> rise to the level of an adverse employment action
> in a retaliation claim if, under the particular
> circumstances, those threats would have deterred a
> reasonable employee from engaging in protected
> activity.  <u>See</u> <u>Burlington</u>, 548 U.S. at 68, 126 S.
> Ct. 2405; <u>Martin v. Gates</u>, 2008 WL 4657807 at
> *10-11 (D. Haw. Oct. 20, 2008) (finding that
> employee made a prima facie claim of retaliation
> where employer made threat of severe disciplinary
> action).  Threats sufficient to deter an employee
> from engaging in protected activity may include

threats to terminate employment, reduce
compensation, or impose administrative leave.
<u>E.E.O.C. v. Collegeville/Imagineering</u>, 2007 WL
2051448, at *8 (D. Ariz. July 16, 2007)
(concluding plaintiff put forth prima facie
evidence of material adverse action by showing
supervisor with requisite power threatened to
terminate plaintiff); <u>Lee v. Winter</u>, 439 F. Supp.
2d 82, 85 (D.D.C. 2006) (finding threat of reduced
compensation constitutes materially adverse action
after Burlington ); <u>Killen v. Nw. Human Servs.,
Inc.</u>, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7,
2007) (finding that the threat of placement on
administrative leave could have dissuaded a
reasonable employee from making a discrimination
claim).  "A fair reading of [<u>Burlington</u>] reveals
that the case imposes no requirement that a threat
be fulfilled." <u>Walsh v. Irvin Stern's Costumes</u>,
2006 WL 2380379, at *2 (E.D. Pa. Aug. 15, 2006);
<u>see also</u> <u>Williams v. W.D. Sports, N.M., Inc.</u>, 497
F.3d 1079, 1090 (10th Cir. 2007) (finding
combination of threats and actions could dissuade
reasonable employee).

<u>Kosegarten v. Dep't of Prosecuting Attorney</u>, Civil No. 10–00321

LEK–KSC, 2013 WL 655461, at *21–22 (D. Hawai`i Feb. 21, 2013)

(some alterations in <u>Kosegarten</u>) (quoting <u>D'Andrea v. Univ. of

Hawaii</u>, 686 F. Supp. 2d 1079, 1088 (D. Hawai`i 2010)).  This

Court concludes, as a matter of law, that Global Horizons's

treats of deportation and threats of transfer to farms where

there was less work and less pay would deter a reasonable

employee from engaging in protected activity.  This Court

therefore finds that there are no genuine issues of material

fact, and that the Claimants suffered materially adverse

employment actions.  This Court also finds that the adverse

employment actions that Global Horizons took against the

Claimants were so common as to constitute Global Horizons's standard operating procedure in response to complaints about discriminatory treatment of Thai workers.

Further, based on the nature of Global Horizons's threats – that any Claimant who complained about the discriminatory treatment would be deported or transferred – this Court finds that there are no genuine issues of material fact, and that there was a causal relationship between Claimants' protected activity and the material adverse actions by Global Horizons. This Court therefore finds that the EEOC has established all of the elements of its prima facie case for pattern and practice retaliation. Although retaliation claims are subject to the McDonnell Douglas burden-shifting framework, see Dawson, 630 F.3d at 936, Global Horizons has not responded to the Retaliation Motion and therefore has not identified any evidence that raises a genuine issue of material fact as to whether there was a legitimate, nondiscriminatory reason for its actions. This Court therefore concludes that the EEOC is entitled to judgment as a matter of law as to the portion of Count I alleging a pattern and practice claim of retaliation by Global Horizons. The EEOC's Retaliation Motion is GRANTED.

## CONCLUSION

On the basis of the foregoing, the EEOC's Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Claim

of Hostile Work Environment Against Defendant Global Horizons, Inc., the EEOC's Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Claim of Disparate Treatment Against Global Horizons, and the EEOC's Motion for Partial Summary Judgment on the EEOC's Pattern or Practice Claim of Retaliation Against Global Horizons, all filed November 1, 2013, are HEREBY GRANTED.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, March 19, 2014.



/s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

**EEOC VS. GLOBAL HORIZONS, INC., ET AL.; CIVIL 13-00257 LEK-RLP; ORDER GRANTING PLAINTIFF'S: MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF HOSTILE WORK ENVIRONMENT AGAINST DEFENDANT GLOBAL HORIZONS, INC.; MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF DISPARATE TREATMENT AGAINST GLOBAL HORIZONS, INC.; AND MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE EEOC'S PATTERN OR PRACTICE CLAIM OF RETALIATION AGAINST GLOBAL HORIZONS, INC.**